IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL SPECIALTY UNDERWRITERS, INC., a Washington corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08CV2360 |
| v. | ) ) | |
| MATTHEW ANDERSON, an individual, and CRC INSURANCE SERVICES, INC., an Alabama corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
ITS EMERGENCY RULE 65 MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

Plaintiff NATIONAL SPECIALTY UNDERWRITERS, INC. ("NSU" or the "Company"), by its undersigned attorneys, submits the following Memorandum of Law in Support of Its Emergency Rule 65 Motion for Temporary Restraining Order and Preliminary Injunction:

## I.    INTRODUCTION

As fully set forth in its Verified Complaint for Injunctive and Other Relief (the "Complaint")[1], NSU, a wholesale insurance broker, seeks immediate injunctive relief to stop Defendant Matthew Anderson ("Anderson"), a former employee of NSU and current employee of co-Defendant CRC Insurance Services, Inc. ("CRC"), from breaching the terms of his Confidentiality and NonCompetition Agreement (the "Non-Compete Agreement") with NSU, misappropriating NSU's confidential information and trade secrets (collectively, the "Confidential Information"), tortiously interfering with NSU's contractual and prospective economic advantage, and conspiring with CRC to engage in unfair competition.

---

[1]   NSU incorporates herein its statement of facts from its Complaint as well as the content of the Declaration of Nick Hatzopoulos, which is attached hereto as Exhibit A.

NSU also seeks immediate injunctive relief to stop CRC from misappropriating NSU's Confidential Information, tortiously interfering with NSU's contractual and prospective economic advantage, tortiously interfering with NSU's contractual relationships with Anderson, and conspiring with Anderson to engage in unfair competition.

Neither Anderson nor CRC can dispute that Anderson, on behalf of himself and at the direction and as an agent of CRC, has successfully solicited at least two of NSU's clients to terminate their relationships with NSU and move their business to CRC, and sought to obtain NSU's Confidential Information. NSU is entitled to immediate and emergency injunctive relief to stop Anderson's and CRC's illegal conduct.

## II.     ARGUMENT

Fed. R. Civ. P. 65 authorizes this Court to issue an interlocutory injunction if NSU demonstrates that (1) it has some likelihood of success on the merits of its claims; (2) there is no adequate remedy at law and it will endure irreparable harm if injunctive relief is not granted; (3) the harm that Anderson and CRC will suffer if the injunction is granted does not outweigh the harm to NSU; and (4) the public interest would not be adversely affected by the issuance of the injunction. *E.g., Meridian Mut. Ins. Co. v. Meridian Ins. Group Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997).

### A.     NSU is Likely to Succeed on the Merits of Its Claims

NSU requires preliminary injunctive relief to protect its long-standing client relationships, as well as its Confidential Information, against Anderson's and CRC's on-going and threatened unlawful conduct. NSU need only demonstrate that it has a "'better than negligible' chance of succeeding on the merits to justify injunctive relief." *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1984 (7th Cir. 1988) (internal quotes omitted). This "threshold is low." *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986). Here, NSU has demonstrated that its chances of succeeding on its claims are "better than negligible."

### 1. Anderson Has Breached the Terms of the Non-Compete Agreement

The terms of the Non-Compete Agreement are straightforward: they bar Anderson from, among other things, (a) misappropriating NSU's Confidential Information; (b) soliciting NSU's clients for a 24-month period following the termination of his employment with NSU; and (c) accepting business from NSU's clients for a 24-month period following the termination of his employment with NSU. (*See* Exhibit A to the Complaint).

Anderson cannot dispute that he has induced at least two NSU clients to terminate their relationships with NSU and move their business to CRC, that he is responsible for servicing those clients at CRC, and that he has attempted to obtain and misappropriate NSU's Confidential Information. For example, on March 7, 2008, NSU received notice from Northeast Insurance and Financial Consultants (NIFC) that NIFC wished to change its broker of record from NSU to CRC for the PrimeCare Medical, Inc. ("PrimeCare") account. NIFC changed its broker of record to CRC for the PrimeCare policy at the urging of Anderson. Anderson was responsible for servicing the NIFC/PrimeCare while he was employed by NSU, and but for his employment with NSU, he would not have had access to NIFC/PrimeCare.

Similarly, on March 25, 2008, NSU received notice that retail broker Frank J. Siragusa & Son ("Siragusa & Son") wished to change its broker of record from NSU to CRC for the Southeastern Service Group, Inc. ("Southeastern") account. As with NIFC/PrimeCare, Anderson was responsible for inducing Siragusa & Son/Southeastern to change brokers of record. Anderson was responsible for servicing the Siragusa & Son/Southeastern account during his employment with NSU, and he would not have had access to Siragusa & Son/Southeastern had he not been employed by NSU.

It is no coincidence that Anderson targeted NIFC/PrimeCare and Siragusa & Son/Southeastern, because Anderson was well aware that these clients' policies were up for renewal. Anderson is now responsible for servicing these accounts on behalf of CRC.

Under Washington law,[2] reasonable post-employment activity restrictions are "valid and enforceable." *Perry v. Moran*, 748 P.2d 224 (Wash. 1987). In determining the reasonableness of the restrictions, Washington courts consider whether the restraint is necessary for the protection of the business or goodwill of the employer; whether it imposes upon the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill; and whether the degree of injury to the public is such loss of the service and skill of the employee as to warrant non-enforcement of the covenant. *Id.*

It is well-established under Washington law that an employer has a protectable interest in protecting its confidential information, trade secrets, and customer relationships. *E.g., Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 942-43 (Wash. 1999) (confidential information and trade secrets); *Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F.Supp.2d 1205, 1216 (E.D. Wash. 2003) (holding that an employer has an interest in "protecting its customer base from depletion by a former employee" and that a former employee is prohibited from using his employer's confidential information to solicit those customers); *Knight, Vale and Gregory v. McDaniel*, 680 P.2d 448, 452 (Wash. 1987) (holding that an employer has a legitimate business interest in maintaining the large and profitable clientele acquired over the years).

Anderson's indisputable conduct constitutes a breach of the terms of the Non-Compete Agreement. Significantly, NSU does not seek to prevent Anderson from working in his chosen profession, or from earning a living. NSU is not disputing his right to work for CRC. Rather, NSU merely seeks to protect its legitimate client relationships and Confidential Information by asking Anderson to abide by his contractual obligations. NSU should not be expected to sit idly while Anderson and CRC poach other NSU clients. *Armour & Co. v. United American Food Processors, Inc.*, 37 Ill.App.3d 132, 137 (1st Dist. 1976) (stating that "preliminary injunctive relief is fashioned to

---

[2] The Non-Compete Agreement has a Washington choice of law provision. (Exhibit A to Complaint at ¶ 10).

prevent the danger of future loss" and that "there is no requirement that a court must wait until an injury occurs before granting relief").

### 2. Anderson and CRC Misappropriated NSU's Trade Secrets

To establish the misappropriation of a trade secret, a plaintiff must prove: (1) the existence of a trade secret; (2) misappropriation of the secret information; and (3) that the secret information was used or was a threat to be used in the defendant's business. *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir. 1992).

### a. The Information NSU Seeks to Protect Constitutes Trade Secrets

The Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/2(d), defines a "trade secret" as "information, including but not limited to technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that is: (1) sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."

Whether the information sought to be protected qualifies as a trade secret focuses fundamentally on the secrecy of such information. *Thermodyne Food Serv. Prods., Inc. v. McDonald's Corp.*, 940 F.Supp. 1300, 1304 (N.D. Ill. 1996); *Stampede Tool Warehouse, Inc. v. May*, 272 Ill.App.3d 580, 588 (1st Dist. 1995) (holding that the key factor to establishing secrecy "is the ease with which the information can be readily duplicated without involving considerable time, effort or expense"). Information is a trade secret if is not generally known to others who could benefit from using it. *Mangren Research & Dev. Corp. v. Natl. Chem. Co., Inc.*, 87 F.3d 937, 942-43 (7th Cir. 1996).

In *Lucini Italia Co. v. Grappolini*, 2003 WL 1989605 (N.D. Ill. 2003), the court held that the plaintiff's research and marketing plans and customer and supplier identities constituted trade secrets because they derived a substantial value from being known to the plaintiff and not to its competitors such that if the plaintiff's competitors were to have access to the information: (a) they would know the plaintiff's plans and strategies while the plaintiff would not know the competitors' plans; (b) they would be able to utilize detailed knowledge of the market and consumer preferences without incurring the cost of obtaining such information from studies and research; and (c) they would be able to anticipate and undercut the effectiveness of the plaintiff's market methods.

NSU's Confidential Information is no different. It derives economic value because it is the product of many hours and thousands of dollars in investment by NSU. If Anderson and CRC are permitted to take NSU's Confidential Information – including NSU's client-related information and the expiration dates of insureds' policies – they will have effectively avoided the need to create this information through their own research, development and hard work. Moreover, NSU has taken aggressive measures to protect the secrecy of its Confidential Information and trade secrets. It secures the confidentiality of the information by protecting access to the information with a computer password, by disseminating the information to employees on a need-to-know basis, and by having employees sign agreements acknowledging the confidential nature of the information. Anderson and CRC cannot argue that they sought to obtain NSU's Confidential Information through public means.

**b.    Anderson's and CRC's Conduct Constitutes Misappropriation**

"Misappropriation" includes the acquisition or disclosure, or the *threatened acquisition or disclosure*, of a trade secret. 765 ILCS 1065/2(b). The ITSA also specifies that improper means of acquiring a trade secret include "breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use." 765 ILCS 1065/2(a).

There is little doubt that Anderson and CRC have misappropriated NSU's valuable trade secrets. Through unlawful and scheming methods, Anderson, on behalf of himself and at the direction of CRC, has specifically targeted NSU clients whose insureds' polices are up for renewal. Anderson and CRC have engaged in such conduct to gain a competitive advantage for themselves, an advantage that they have been unable to obtain through legal means.

### c. Anderson's and CRC's Misappropriation of NSU's Trade Secrets Entitles NSU to Immediate Injunctive Relief

"Actual or threatened misappropriation may be enjoined" under the ITSA. 765 ILCS 1065/3(a). The scope and nature of the remedy must be tailored to fit the facts of a particular case and should be as broad as necessary to protect the rights of the plaintiff. *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1137 (7th Cir. 1996); *Nobel Biocare USA, Inc. v. Lynch*, 1999 WL 958501 (N.D. Ill. 1999). Where a statute expressly authorizes injunctive relief, a plaintiff need only show the defendant's violation of the Act. *Illinois Bell Tel. Co. v. Lake County Grading*, 313 Ill.App.3d 184, 189 (2nd Dist. 2000). *Accordingly, the general rules of equity requiring a showing of irreparable injury and a lack of an adequate remedy at law need not be shown. Id.*; *Lucini Italia*, 2003 WL 1989605 at *18 ("Thus, to the extent that Lucini's request for injunctive relief is based on Grappolini's violation of Lucini's trade secret[s], Lucini is not required to establish irreparable injury and a lack of adequate legal remedy").

In light of these facts, NSU needs the protection provided by the ITSA. If Anderson and CRC are not enjoined and they are successful in their future attempts to obtain NSU's Confidential Information, NSU's business will be devastated.

### 3. Anderson and CRC Tortiously Interfered with NSU's Contractual and Prospective Economic Advantage

Illinois courts have uniformly agreed that a defendant can be held liable for interfering with a plaintiff's established or expected business relationships. *E.g., Dowd & Dowd, Ltd. v. Gleason*, 181

Ill.2d 460 (1998). To prove a claim for tortious interference, a plaintiff must demonstrate: (1) its reasonable expectation of continuing a valid business relationship; (2) defendants' knowledge of the plaintiff's expectancy; (3) purposeful conduct by the defendants that prevents the plaintiff's legitimate expectancy from ripening into a continued business relationship; and (4) damages to the plaintiff resulting from such interference. *Id.* This Court may properly issue an injunction to prevent Anderson and CRC from interfering with NSU's customer goodwill, economic expectancies and its contractual relationships with its customers. *E.g., Paul L. Pratt, P.C. v. Blunt*, 140 Ill.App.3d 512, 519 (5th Dist. 1986) (affirming injunction and holding that "plaintiff could properly seek to enjoin conduct of the defendants that allegedly interfered with its relationship with clients"); *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 62 Ill.App.3d 671, 683 (1st Dist. 1978) (reversing trial court's denial of injunction and holding "the right to acquire property . . . by the conduct of a lawful business, is as much entitled to protection as the right to guard against property already acquired").

Here, Anderson, on behalf of himself and at the direction of CRC, has induced at least two of NSU's clients to terminate their relationships with NSU and move their business to CRC. But for Anderson's and CRC's misconduct, NSU's relationships with its clients would have continued uninterrupted. Indeed, NSU was in the final stages of closing the renewal of the NIFC/PrimeCare policy when Anderson abruptly resigned and Anderson and CRC induced NIFC/PrimeCare to change its broker of record from NSU to CRC.

### 4. CRC has Tortiously Interfered with NSU's Contractual Agreements with Anderson

To succeed on the merits of its claim for tortious interference with a contract, a plaintiff must prove: (1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) that the defendant was aware of the contract; (3) that the defendant intentionally and unjustifiably induced a breach of the contract; (4) that the wrongful conduct of the defendant caused a subsequent

breach of the contract by the third party; and (5) that the plaintiff was damaged as a result. *Poulos v. Lutheran Social Services of Illinois, Inc.*, 312 Ill.App.3d 731 (1st Dist. 2000).

Here, NSU and Anderson are party to a valid contact – the Non-Compete Agreement – the terms of which preclude Anderson from misappropriating NSU's Confidential Information and from soliciting and/or accepting business from NSU's clients. CRC is well aware of the existence of the Non-Compete Agreement, and it has brazenly encouraged Anderson to breach the terms of the contract by instructing him to solicit the NIFC/PrimeCare account and by agreeing to indemnify Anderson in any lawsuit brought by NSU. *E.g., RKI, Inc. v. Grimes*, 177 F.Supp.2d 859, 880 (N.D. Ill. 2001) ("Chicago Roll had Grimes sign an indemnity agreement on his first day of work providing that he would indemnify and defend Chicago Roll if it were sued by Roll-Kraft for employing Grimes. This calculated risk constituted a conscious disregard of the rights of Roll-Kraft.").

### 5.    Anderson and CRC Have Conspired to Harm NSU

Civil conspiracy consists of (1) an agreement between two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, and (3) some tortious or illegal act by a party to the agreement in furtherance of the agreement. *E.g., Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 62-63 (1994). The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer and to those who have merely planned, assisted, or encouraged the wrongdoer's acts. *Id.* at 62. A conspiracy is almost never susceptible to direct proof, but rather is usually established from circumstantial evidence and inferences drawn from the evidence. *Duncan v. Peterson*, 359 Ill.App.3d 1034, 1050 (2nd Dist. 2005), *citing Adcock.*

Here, the evidence establishes that Anderson and CRC conspired to harm NSU and engaged in concerted unlawful conduct to achieve their objective. Despite vowing on March 6, 2008 that he would honor his contractual obligations and not solicit any of NSU's clients, the very next day – after speaking to his new boss at CRC – Anderson began soliciting NSU's clients. On March 7, the day

-9-

after his resignation, NSU received a letter from NIFC designating CRC as its broker of record on the PrimeCare account. On March 25, 2008, NSU received notice that a second client was changing its broker of record designation from NSU to CRC. And on March 28, Anderson told Hatzopoulos during lunch that CRC had agreed to indemnify Anderson in this lawsuit, thereby confirming that it is directing Anderson to breach his legal obligations to NSU.

### C.      NSU Will Suffer Irreparable Harm Without Immediate Injunctive Relief

"Irreparable injury" does not refer to injury that is "beyond repair or compensation in damages, but denotes transgressions of a continuing nature." *R.L. Polk & Co. v. Ryan*, 296 Ill.App.3d 132, 142 (1st Dist. 1998); *Leen v. Carr*, 945 F. Supp. 1151 (N.D. Ill. 1996) (holding that injunctive relief should be granted where a remedy at law would not provide a remedy which is as "clear, complete and as practical and efficient to the ends of justice in its prompt administration as an equitable remedy"). "Once a protectable interest is established, irreparable injury is presumed if the interest remains unprotected." *A-Tech Computer Services v. Soo Hoo*, 254 Ill.App.3d 392, 400 (1st Dist. 1993).

Indeed, NSU can properly obtain preliminary injunctive relief based on the threat alone that Anderson's and CRC's misconduct will cause the Company harm. *Gannett Outdoor of Chicago v. Baise*, 163 Ill.App.3d 717, 722-23 (1st Dist. 1987) ("[W]e believe that plaintiff need not show an actual loss of sales or profits before the trial court can grant a preliminary injunction. . . . [T]he evidence shows a legitimate threat to plaintiff's business interest and irreparable harm may result if this interest is not protected by a preliminary injunction."); *Office Electronics, Inc. v. Grafic Forms, Inc.*, 56 Ill.App.3d 395, 399 (2nd Dist. 1978) ("While no evidence of sales actually lost to Grafic was presented at the hearing on the motion for preliminary injunction, there is no requirement that a court must wait until an injury occurs before granting relief"). A business' loss of competitive position is intangible, incapable of being measured. *Cross Wood Products, Inc. v. Sutter*, 97 Ill.App.3d 282, 286 (1st Dist. 1981) ("competitive disadvantage" is a "type of harm [] of intangible though very real nature which

-10-

[is] not subject to measurement by any certain pecuniary standard . . . and thus cannot be classified as 'adequate'").

Here, Anderson and CRC have engaged in a course of conduct which, at a minimum, threatens NSU's operations, revenues and profits, and customer good will. Anderson's and CRC's transgressions are ongoing and are likely to extend to NSU's other clients. Without an immediate injunction prohibiting Anderson and CRC from engaging in their misconduct, NSU's injuries will continue through the date of trial – when it simply would be too late to remedy the wrongs inflicted by them.

### D.     The Balance of Harms and Public Interest Both Favor NSU

In connection with injunction orders, courts are often tasked with "balancing harms" to the parties, namely, whether NSU will suffer greater harm without the injunction than Anderson and CRC will suffer if it is issued. *Buzz Barton & Assoc., Inc. v. Giannone*, 108 Ill.2d 373, 387 (1985). However, such an analysis is not required or warranted in this case because "[i]t is well-established in Illinois that the [balancing harms] doctrine is *inapplicable* where a defendant's actions are done with full knowledge of the plaintiff's rights and with an understanding of the consequences which might ensue." *Preferred Meal Systems*, 199 Ill.App.3d at 727 (emphasis added).

Even if potential "harms" were weighed, the harm of denying NSU injunctive relief far outweighs the harm Anderson and CRC may endure if restrained from contacting, soliciting and accepting business from NSU's clients and stealing NSU's Confidential Information. NSU seeks only to enjoin Anderson's and CRC's intentional unlawful activity. If the injunction is not granted, NSU faces the reality of significant financial losses which could have severe negative ramifications. To permit Anderson and CRC to continue their current practices would be to sanction their wrongdoing and send a regrettable message that there are no consequences for unlawful conduct. As the court stated in *ABC*, "it is hard to see how anyone can claim immunity for a tort on the ground that it was

innocently done, when at the time of doing it he knew his right to do it was disputed by the person affected." 62 Ill.App.3d at 687 (internal quotes omitted).

## III. CONCLUSION

For the foregoing reasons, this Court should issue a temporary restraining order as requested in NSU's contemporaneously filed Motion, on such terms as requested and on such other terms as this Court deems just and equitable.

Dated: April 28, 2008   Respectfully submitted,

            **NATIONAL SPECIALTY UNDERWRITERS, INC.**

            By: ___/s/ Chad W. Moeller_____
               One of Its Attorneys

Chad W. Moeller
Eugene A. Boyle
NEAL GERBER & EISENBERG LLP
2 N. LaSalle St., Suite 2200
Chicago, Illinois 60602
(312) 269-8000

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he served a copy of the foregoing Plaintiff's

Memorandum of Law in Support of Its Emergency Rule 65 Motion for Temporary Restraining Order

and Preliminary Injunction on:

Edward F. McCormack
Nixon Peabody LLP
161 N. Clark Street
48th Floor
Chicago, Illinois 60601-3213
(Counsel for CRC Insurance Services, Inc.)

– and –

Matthew Anderson
1212 S. Michigan Avenue
Apartment 2910
Chicago, Illinois 60605

by messenger this 28th day of April, 2008.


        /s/ Chad W. Moeller
        One of the Attorneys for Plaintiff National Specialty
        Underwriters, Inc.

NGEDOCS: 1520526.1

-13-